IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MICHELLE DUNCAN,<br><br>                    Plaintiff,<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>                    Defendant. | MEMORANDUM ORDER AND DECISION GRANTING PLAINTIFF'S MOTION FOR DECISION ON THE RECORD<br><br>Case No. 2:15-CV-626TS<br><br>District Judge Ted Stewart |

This matter is before the Court on the parties' cross-motions for Summary Judgment in Ms. Duncan's ERISA claim.  For the reasons set out below, the Court will grant Ms. Duncan's Motion and request for attorney's fees and costs, remand the case to MetLife for further proceedings, and order Ms. Duncan to submit an affidavit detailing attorney's fees and a bill of costs.

## I.   BACKGROUND

Michelle Duncan began working for U.S. West Paging after she graduated from high school.  For the next twenty-two years, Ms. Duncan worked for the company as it transitioned to U.S. West Wireless and finally to Verizon.[1]  Her most recent position was as a Global Enterprise Manager.  She reported having a very positive work history.  Her husband described her as "jovial, lighthearted, confident . . . sharp, driven."[2]  However, beginning in 2010, symptoms of depression, paranoia, and ADHD began interfering with Ms. Duncan's emploment.  According

---

[1] R. 911.

[2] R. 670.

to Ms. Duncan, her workload had increased and "things she used to be able to do quickly were taking longer and she was working up to 16 hours a day to complete tasks."[3]  She reported being "told she wasn't making sense when she talked" and she began having paranoid thoughts involving her co-workers.[4]

In April 2011, Ms. Duncan claimed she was receiving 200 emails per day while traveling to and from work-related conferences.[5]  At that time, Ms. Duncan visited a doctor who noted job stress and severe ulcers.[6]  Ms. Duncan's job was described as an "8 to 5" job and a "light duty" position, but she was expected "to do what [she had] to do to get the job done" and was exempt from accruing overtime hours.[7]  Ms. Duncan's husband told doctors that Ms. Duncan would "stare at a computer screen trying to construct a simple sentence (with 1400 emails to respond to).  She felt hopeless, couldn't get back on top of the workload."[8]  Ms. Duncan described "horrible anxiety."[9]  In April 2011, Dr. Kirkham found Ms. Duncan positive for psychiatric symptoms.[10]  The following month, Dr. Polk recorded that Ms. Duncan was paranoid, with racing thoughts, was suffering from sleep deprivation, and was experiencing auditory hallucinations.[11]

---

[3] R. 909.

[4] *Id.*

[5] R. 658.

[6] R. 658.

[7] R. 149, 151.

[8] R. 670; *see also* R. 704 (noting that Ms. Duncan "was struggling to respond to emails and doing simple tasks that she was able to do when [her husband] met her").

[9] R. 670.

[10] R. 657.

[11] R. 658.

From 2010 until December 2011, Ms. Duncan labored under paranoid delusions at work, believing that co-workers were attempting to poison her, that spam mail was part of a government scheme to compensate her, and that a supervisor was locking her out of a computer system, among other things.[12]  In September 2011, Ms. Duncan traveled to San Diego on a business trip when she became confused about where she was or why she was there, and paranoid that someone was "targeting her."[13]  Ms. Duncan resumed work at Verizon intermittently until December 5, 2011, when Dr. Polk found that Ms. Duncan desired to work but had "disabling anxiety, mood swings and difficulty to focus and attention [sic]."[14]  Dr. Polk concluded that Ms. Duncan was "[u]nable to return to work indefinitely."[15]

Ms. Duncan was a participant in Verizon Wireless' disability benefits plan (the "Plan"). The Plan promised benefits to participants who became unable to perform the essential functions of their occupation due to illness or injury.  First, it promised short term disability ("STD") benefits for up to twenty-six weeks.[16]  Second, the Plan promised limited long-term disability ("LTD") benefits for up to twenty-four months at a discounted rate if an employee's disability remained.[17]  Third and finally, the Plan promised continuing discounted benefits to insureds with a mental or nervous disability attributable to schizophrenia, dementia, or organic brain disease.[18]

---

[12] R. 659–91.

[13] R. 706.

[14] R. 659.

[15] *Id.*; *see also* R. 707.

[16] R. 51, 54.

[17] R. 63.

[18] R. 64.

These benefits may continue until age sixty-five unless the participant regains the ability to perform a "gainful occupation" for which she is qualified.[19]

Ms. Duncan applied for short term disability benefits in 2011.  MetLife found her eligible and paid the benefits.[20]  In the following months, Ms. Duncan's delusions and auditory hallucinations worsened, and she began having visual hallucinations as well.[21]  She heard voices telling her to do bizarre things.[22]  In response to a voice she believed to be a deity, Ms. Duncan once cleaned her house all night, undressed and wandered the neighborhood, repeatedly washed her hair in the toilet, and later attempted to drown herself, among other things.[23]  In the midst of delusions, she sometimes did not recognize her own family members.[24]  Her delusions were numerous and varied; they persisted for days or weeks in some cases and occasionally endangered herself and her family.[25]  After three major psychotic breaks, Ms. Duncan was admitted to Salt Lake Behavioral Health Center in July 2012.  After being discharged, she regressed and was hospitalized two more times before the end of the year.[26]  Between 2012 and 2013, Ms. Duncan was diagnosed with a variety of psychotic, mood, and stress-related disorders.[27]  Specifically, doctors began noting features suggesting schizophrenia in June 2012,

---

[19] R. 63, 1166.

[20] *See* R. 134–324 (detailing MetLife's investigation of Ms. Duncan's STD claim).

[21] R. 713.

[22] R. 664.

[23] R. 662–63, 665.

[24] R. 662–63, 675; *see also* R. 672, 705–08 (describing a number of delusions).

[25] R. 662–63, 707.

[26] Ms. Duncan was re-admitted to Salt Lake Behavioral in September 2012 and later hospitalized at the University Neuropsychiatric Institute in December 2012.  R. 670, 707–08.

[27] R. 661–62.

and again in December 2012.[28]  Dr. Oldroyd believed that Ms. Duncan had a schizophrenia spectrum disorder, and eventually settled on a diagnosis of schizoaffective disorder, depressed type.[29]

In March 2014, Dr. Parsons, a psychologist hired by MetLife, diagnosed Ms. Duncan with Schizoaffective Disorder, Multiple Episodes Currently in Partial Remission in accordance with the DSM-5.[30]  Dr. Parsons explained that Ms. Duncan was "at a stable point in her illness with partial remission of her symptoms,"[31] but was "vulnerable to future episodes and her functional capacity may diminish significantly during exacerbations of her illness . . . .  Stress can contribute to the start of a schizoaffective episode."[32]  Dr. Parsons concluded that "future exacerbations with particularly severe symptoms may require hospitalization for stabilization."[33]

MetLife denied Ms. Duncan continuing benefits and upheld its denial on appeal.  In its uphold letter, MetLife grounded its denial solely in its interpretation that the schizophrenia exclusion does not include schizoaffective disorder.[34]  Ms. Duncan argues that MetLife's interpretation was arbitrary and capricious.

## II.  STANDARD OF REVIEW

Where an ERISA plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, courts "employ a deferential standard

---

[28] R. 673, 812 (noting psychotic symptoms on June 27, 2012 and that Ms. Duncan "has been diagnosed as possibly bipolar and possibly schizophrenic"); *see also* R. 666; 702–05.

[29] R. 668, 706–07.

[30] R. 923.

[31] R. 923–24.

[32] R. 924.

[33] R. 925.

[34] R. 619–22.

of review, asking only whether the denial of benefits was arbitrary and capricious."[35]  The Plan grants MetLife discretionary authority "to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."[36]  The Court will review MetLife's decision to deny Ms. Duncan's claim under the arbitrary and capricious standard.

Using this standard, "we ask whether the administrator's decision was reasonable and made in good faith."[37]  A decision to deny benefits based on an interpretation of a plan's language "is arbitrary and capricious if it is not a reasonable interpretation of the plan's terms."[38]  The Court looks for "'substantial evidence' in the record to support the administrator's conclusion, meaning 'more than a scintilla' of evidence 'that a reasonable mind could accept as sufficient to support a conclusion.'"[39]

This Court's review in ERISA cases involves the consideration of "several different, often case-specific, factors, reaching a result by weighing all together."[40]  One factor, applicable in this case, is an administrator's conflict of interest between its own financial interest and the interests of plan participants.  Where factors are closely balanced, any one factor can act as a tiebreaker.[41]

---

[35] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (citation and internal quotation marks omitted).

[36] R. 130.

[37] *Eugene S.*, 663 F.3d at 1133 (quoting *Phelan v. Wyo. Associated Builders*, 574 F.3d 1250, 1256 (10th Cir. 2009)).

[38] *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1259 (10th Cir. 1998).

[39] *Eugene S.*, 663 F.3d at 1134 (quoting *Adamson v. UNUM Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

[40] *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).

[41] *Glenn*, 554 U.S. at 117.

6

III.  DISCUSSION

*1.  MetLife's Conflict of Interest*

ERISA imposes "higher-than-marketplace quality standards on insurers.  It sets forth a special standard of care upon a plan administrator, namely, that the administrator 'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan."[42]  Here, MetLife serves both as plan administrator and as third party insurer, and is therefore a "conflicted administrator."[43]  Because it both evaluates claims and funds the plan, every dollar provided in benefits is a dollar spent by MetLife, while every dollar saved is a dollar in MetLife's pocket.[44]  MetLife's dual role creates a danger of biased decision-making because MetLife's obligation to its insureds "may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary."[45]

Congress, in enacting ERISA, desired "to offer employees enhanced protection for their benefits."[46]  One way district courts effectuate this desire is by taking into account the existence of a conflict of interest as a factor in reviewing an administrator's denial of benefits.[47]  The conflict of interest factor should prove "more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision."[48]  On the other

---

[42] *Id.* at 115 (quoting 29 U.S.C. § 1104(a)(1)).

[43] *Gielas v. Life Ins. Co. of N. Am.*, No. 08-cv-01922-MSK-CBS, 2009 U.S. Dist. LEXIS 112848, at *6 (D. Colo. Nov. 13, 2009) (unpublished).

[44] *See Glenn*, 554 U.S. at 112 (quoting *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3rd Cir. 1987)).

[45] *Id.*

[46] *Id.* at 114 (internal quotation marks omitted).

[47] *Id.* at 108.

[48] *Id.* at 117.

hand, it "should prove less important (perhaps to the vanishing point) where the administrator

has taken active steps to reduce potential bias and to promote accuracy."[49]

### a.   *MetLife's hiring of independent medical professionals*

MetLife argues that the conflict of interest factor should be given little weight because

MetLife retained an independent psychiatrist to review the medical records and an independent

psychologist to examine Duncan.  The hiring of non-employee medical professionals may lessen

a conflict, but does not resolve it.[50]  In addition, the doctors' roles in this case were limited to

determining a diagnosis and discussing disability, issues that are not disputed in this case.  The

independent medical professionals were not asked to interpret the term "schizophrenia" or to

explain the differences or similarities between schizophrenia and schizoaffective disorder.

Because MetLife's interpretation of schizophrenia is the sole issue before the Court, the hiring of

outside doctors has little effect on MetLife's conflict of interest in this case.

### b.   *MetLife's administration of Ms. Duncan's claim*

MetLife also argues that the Court should give little weight to the conflict of interest

factor on the grounds that "MetLife administered Duncan's claim in a fair and objective

manner."[51]  Ms. Duncan, on the other hand, argues that MetLife inappropriately delegated the

responsibility of interpreting Plan language to Dr. Meissler, a medical professional, and that Dr.

Meissler's decision was rubber stamped by claims adjusters.  As discussed below, evidence in

---

[49] *Id.*

[50] *See Loughray v. Hartford Grp. Life Ins. Co.*, 366 F. App'x 913, 924 (10th Cir. 2010) (unpublished) (finding the conflict of interest of little weight when the insurer employed the services of an independent medical examiner and the claimant never presented persuasive evidence undermining the expert's independence); *Matthews v. Hartford Life & Accident Ins. Co.*, No. 1:14-CV-94 TS, 2015 U.S. Dist. LEXIS 76623, at *7 (D. Utah June 12, 2015) (unpublished) (finding the conflict mitigated but not obviated by hiring independent physicians).

[51] Docket No. 19, at 18.

the administrative record suggests procedural irregularities in the way MetLife formulated, documented, and explained its interpretation of the schizophrenia exclusion.

In 2014, after granting short term and limited long term benefits, MetLife's LTD claims specialist discussed the potential for a "new Dx of Schizo Affective Disorder" and hypothesized that Ms. Duncan and her treating doctor were "requesting new Dx as they are aware willi [sic] extend benefits to age 65."[52]  The specialist went on to note that Ms. Duncan's prior diagnosis was "limited by LDB[53] . . . potential to extend if new Dx is supported RLs."[54]  The claims specialist acknowledged receiving information from Ms. Duncan's psychiatrist "to be reviewed for change in dx from LDB to non-LDB," and referred Ms. Duncan's file for "full-file review and possibly higher level review."[55]

MetLife employees arranged a "claim discussion" with MetLife's psychiatric medical director ("PMD"), Dr. Meissler, to consult regarding medical reports from independent medical examiners.[56]  During that discussion, Dr. Meissler communicated to the other employees that "[g]iven the medical evidence in support of the Schizoaffective diagnosis, *which is not an exclusion to the LDB*, the claim is not supported beyond the LDB of 4-01-14."[57]

Dr. Meissler was the first to opine that the Plan's exclusion for "schizophrenia" would not include schizoaffective disorder.  Dr. Meissler's opinion subsequently became the position of MetLife on the issue, and claims adjusters repeatedly referenced Dr. Meissler's interpretation as

---

[52] R. 508–09.

[53] "LDB" refers to "Limited Disability Benefits," a Plan provision that limits benefits for many disabilities to two years unless they fall under a listed exclusion.

[54] R. 509.

[55] R. 513.

[56] R. 550.

[57] R. 553–54 (emphasis added).

a basis for denying Ms. Duncan's claim.[58]  MetLife speculated in oral argument that Dr. Meissler's statement was simply "her take" on the issue, not the final decision, and that the doctor was simply summarizing and phrasing medical evidence using terminology that claims adjusters would understand.  This speculation is belied by the clear language in the claim file that "Per PMD, Dr. Meissler, Schizoaffective D/O falls under LTD."[59]

If Dr. Meissler gave a reason for her interpretation, it is not recorded in the claim file.  A LTD claims specialist and a LTD unit leader later noted their agreement with Dr. Meissler's interpretation, but also failed to document any rationale for that interpretation before denying Ms. Duncan's claim.[60]  While internal messages show that MetLife initially believed it could deny Ms. Duncan's claim either for lack of disability or its interpretation of schizophrenia, MetLife's denial letter focused almost exclusively on the issue of disability.  The only hint to Ms. Duncan that MetLife's interpretation of schizophrenia did not encompass schizoaffective disorder was couched in the following language:

> The Medical Director [Dr. Meissler] opined that your records do not suggest any long-lasting mental health symptom(s) or significant global psychiatric functional limitations which would support a non-limited or excluded condition. . . .
> [T]he file lacks clinical evidence to support a functional impairment . . . to support a non-limited or excluded condition.
> The determination of disability is not solely based on diagnosis, but is based on functional ability . . . .[61]
> The Court finds the letter's language so vague that it would not have given Ms. Duncan

or any reasonable participant notice that MetLife was denying benefits due to an interpretation of

---

[58] *See* R. 580 ("Dr. Meissler Medical Director advised that a schizoaffective disorder was not an LDB and benefits were terminated."); R. 556, 559 ("[L]imitations based on dx of Schizoaffective D/O are not supported . . . . Please see PMD diary under claim comment).

[59] R. 554.

[60] R. 556, 561.

[61] R. 904

schizophrenia.  As a result, the supplemental information submitted by Ms. Duncan and her treating doctors focused on disability rather than Ms. Duncan's diagnosis.

When Ms. Duncan appealed MetLife's decision, an appeals specialist completed an "Appeal Decision Review."[62]  The specialist checked a box marked "Proceed with decision," but failed to complete the sections titled "Correct Definition of Disability/Plan Provision," and "Decision rationale clearly documented."[63]  There is no indication that MetLife undertook a meaningful review of these issues.  In its letter upholding the denial, MetLife dropped disability as a basis for denial, but informed Ms. Duncan for the first time that it had interpreted schizophrenia in a way that made her ineligible for benefits.  MetLife stated that an Appeals Psychiatric Clinical Specialist ("APCS") had "indicated that [Ms. Duncan's] disabling diagnosis was schizoaffective disorder, which would not support a diagnosis of schizophrenia," and that "schizoaffective disorder [is] a separate diagnosis from schizophrenia with its own diagnostic criteria."[64]

Setting aside the reasonableness of MetLife's substantive interpretation, the procedures by which MetLife reached, documented, and explained its interpretation of schizophrenia were unreasonable.  MetLife allowed a medical director, assigned the limited role of "review[ing] IME testing," to single-handedly interpret the scope of an undefined Plan term without documenting any rationale.  Dr. Meissler's decision was accepted up the claims adjusting ladder without any additional rationale until it reached the APCS.

---

[62] R. 631.

[63] *Id.*

[64] R. 607.

The Department of Labor's implementing regulations require that a claim denial include "[t]he specific reason or reasons for the adverse determination."[65]  The goals of this requirement are undermined when plan administrators choose to hold a basis for denial "in reserve rather than communicate it to the beneficiary."[66]  The Court "will not permit ERISA claimants . . . to be sandbagged by after-the-fact plan interpretations."[67]  While MetLife did explain its interpretation as a basis for denial prior to this lawsuit, it did so mere paragraphs before informing Ms. Duncan that her remedies were exhausted, leaving her with no chance to supplement the record on the issue and no choice but to litigate her claim.  MetLife's delay defeated the purpose of the implementing regulations and, as a side-effect, has left the Court with an administrative record that has little information regarding the interpretation of schizophrenia.

The procedural irregularities in MetLife's interpretative process heighten the likelihood that MetLife made its interpretation in part to avoid a substantial payment of benefits to Ms. Duncan rather than making a decision based "solely in the interests of the participants and beneficiaries' of the plan."[68]  Therefore, MetLife's conflict of interest is a factor that weighs against affirming MetLife's interpretation in this case.

---

[65] 29 C.F.R. § 2560.503-1(g)(1)(i).

[66] *Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (quoting *Glista v. Unum Life Ins. Co.*, 378 F.3d 113, 129 (1st Cir. 2004)).

[67] *Id.* at 1140 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

[68] *Glenn*, 554 U.S. at 115 (quoting 29 U.S.C. § 1104(a)(1)).

2.  *MetLife's interpretation of the schizophrenia exclusion*

      a.  *The "schizophrenia" exclusion is ambiguous*

Where the interpretation of an ERISA Plan's term is at issue, "the arbitrary and capricious review encompasses the contract law standard of ambiguity."[69]  A provision is ambiguous "if it is susceptible to more than one reasonable interpretation.[70]  In determining whether a plan's language is ambiguous, the language "must be given 'its common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean.'"[71]

The Plan caps benefits due to disability caused by a mental or nervous condition at two years unless the condition is attributable to schizophrenia, dementia, or organic brain disease. The Plan does not define schizophrenia.  MetLife argues that a reasonable person would not understand a diagnosis of schizoaffective disorder to be the same as a diagnosis of schizophrenia. However, Ms. Duncan has submitted numerous webpages that list schizoaffective disorder as a type or category of schizophrenia and has cited numerous judicial opinions that conflate the terms schizophrenia and schizoaffective disorder, sometimes using the term "schizoaffective schizophrenia."  The DSM-5, an authoritative source on the classification of mental disorders,[72] uses the term schizophrenia to refer both to a specific disorder and to a spectrum of disorders,

---

[69] *Flinders*, 491 F.3d at 1193.

[70] *Id.*

[71] *Id.* (quoting *Hickman v. GEM Ins. Co.*, 299 F.3d 1208, 1212 (10th Cir. 2002)).

[72] *See, e.g.*, *Matter of State of N.Y. v. Harris*, 12 N.Y.S.3d 762, 764 (Sup. Ct. 2015) (stating that the DSM is the standard diagnostic handbook used by psychiatrists and psychologists throughout the United States); *People v. New (In re Det. of New)*, 21 N.E.3d 406, 409 (Ill. 2014) (stating that the DSM "provides an authoritative categorical classification of mental disorders"); *Carradine v. Barnhart*, 360 F.3d 751, 770 (7th Cir. 2004) (stating that the DSM is "regarded as a definitive psychiatric authority on mental disorders").

13

including schizoaffective disorder.[73]  In addition, the Plan's exclusion for schizophrenia precedes

an exclusion for dementia, which is a general term that includes many neurocognitive disorders.

For these reasons, the Court finds the Plan's exclusion for schizophrenia may reasonably be

understood as referring to the schizophrenia spectrum of disorders or to the specific disorder of

schizophrenia, and is therefore ambiguous.

### b.  MetLife's interpretation is unreasonable

Where a plan's term is ambiguous but "the plan administrator adopts one of two or more

reasonable interpretations, then the plan administrator's decision to deny benefits based on that

interpretation survives arbitrary and capricious review."[74]  MetLife's interpretation in this case

required that Ms. Duncan have the precise diagnosis of schizophrenia to qualify for this

exclusion.  For the following reasons, the Court finds MetLife's interpretation unreasonable.

### i.  MetLife's interpretation is inconsistent with the DSM

The parties agree that the DSM is an appropriate reference for the disorders at issue and

both parties cite the DSM in their briefs.  In addition, other courts have consulted the DSM when

reviewing an administrator's interpretation of a mental disorder.[75]  The Court will therefore

consider whether the DSM supports or undermines MetLife's interpretation.  The DSM explains

that it is not necessary for an individual diagnosed with schizoaffective disorder to satisfy all the

criteria of schizophrenia.  Specifically: (1) schizophrenia requires a marked loss in occupational

---

[73] *See* DSM-5, at 87–122 (2013) ("Schizophrenia spectrum and other psychotic disorders include schizophrenia, other psychotic disorders, and schizotypal (personality) disorder.").

[74] *Flinders*, 491 F.3d at 1193.

[75] *See Berkoben v. Aetna Life Ins. Co.*, 8 F. Supp. 3d 689, 715 (W.D. Pa. 2014) (citing the DSM for the criteria and definition of schizoaffective disorder).

or social functioning while schizoaffective disorder does not;[76] and (2) a schizophrenic disturbance or episode must exceed six months while a schizoaffective episode may be shorter.[77] On the other hand, those with schizophrenia need not satisfy all criteria of schizoaffective disorder; specifically, schizoaffective disorder requires a mood episode concurrent with active-phase schizophrenia symptoms while schizophrenia does not.[78]

While schizoaffective disorder may be less disabling and shorter in duration, this is not necessarily true in every case.[79]  Substantial occupational and social dysfunction are common in those with schizoaffective disorder, and an uninterrupted period of schizoaffective illness can last "years or even decades," with ongoing "active or residual symptoms of psychotic illness."[80] The DSM provides several hypotheticals illustrating that schizoaffective disorder can be a schizophrenia-plus disorder.  First,

> [i]f the mood symptoms are present for only a relatively brief period, the diagnosis is schizophrenia, not schizoaffective disorder . . . . For example, an individual with a 4-year history of active and residual symptoms of schizophrenia develops depressive and manic episodes that, taken together, do not occupy more than 1 year . . . . This presentation would not meet Criterion C [of schizoaffective disorder].[81]

Second, the DSM explains that a diagnosis of schizoaffective disorder "would be changed to schizophrenia if active psychotic or prominent residual symptoms persist over several years without a recurrence of another mood episode."[82]  In sum, the DSM makes clear that all

---

[76] See id. at 107 ("Criteria B (social dysfunction) . . . [does] not have to be met.").

[77] Id. at 105.

[78] Id. at 106–07.

[79] See id. at 109 (noting in regard to loss of function that "there is substantial variability between individuals diagnosed" with schizoaffective disorder ).

[80] Id. at 107 ("Occupational function is frequently impaired, but this is not a defining criterion [in contrast to schizophrenia]").

[81] Id.

[82] Id. at 109.

features of schizophrenia may be present in an individual suffering from schizoaffective disorder.[83]

While the features and symptoms of the two disorders may co-exist, the diagnoses never do. The DSM makes clear that when all criteria of both disorders are present, only a diagnosis of schizoaffective disorder should be given.[84] As a result, MetLife's reliance on the name of the diagnosis and the diagnostic criteria in the abstract—without attempting to determine whether an individual could actually satisfy the diagnostic criteria of schizophrenia—is an arbitrary and capricious way of defining the scope of schizophrenia exclusion.

### ii.  MetLife's interpretation is inconsistent with other Plan exclusions

The Plan's other exclusions undermine MetLife's interpretation of the schizophrenia exclusion. "Schizophrenia" is followed by the term "dementia,"[85] which is not a single disorder, but rather a group of disorders.[86] The Plan elsewhere excludes physical conditions including vascular malformations, spinal tumors, malignancy, radiculopathies, myelopathies, musculopathies, and "Chronic Fatigue syndrome and related conditions,"[87] all of which are umbrella terms that encompass many diagnoses. The plan includes only a few specific exclusions, including Seropositive Arthritis and Traumatic Spinal Cord Necrosis.[88]

---

[83] *See id.* (stating that Criteria C for schizoaffective disorder—the mood component—"is designed to separate schizoaffective disorder from schizophrenia"); *see also id.* at 89–90 ("There is growing evidence that schizoaffective disorder is not a distinct nosological category.").

[84] *Id.* at 99.

[85] R. 64.

[86] *See* DSM-5, at 591 (listing types neurocognitive disorders, formerly known as dementias).

[87] R. 64.

[88] *Id.*

The Plan defines the specific exclusions not in terms of diagnoses, but by features or criteria.[89]  For example, to qualify for the Seropositive Arthritis exclusion, a participant must have "an inflammatory disease of the joints supported by clinical findings of arthritis plus positive serological tests for connective tissue disease."[90]  There is no requirement that the participant have the precise diagnosis of "seropositive arthritis."  MetLife's requirement that Ms. Duncan be diagnosed with schizophrenia, without considering whether Ms. Duncan's condition satisfied the criteria of schizophrenia is inconsistent with the requirements for any other exclusion.

### iii. Analogous case law does not support MetLife's interpretation

Where interpretation of a Plan term rather than disability is at issue, the Tenth Circuit has considered analogous case law interpreting the term.[91]  Ms. Duncan cites many cases, but only one where ERISA plan participants with schizoaffective disorder were treated differently than those with schizophrenia.  In *Berkoben v. Aetna Life Insurance Co.*, an ERISA Plan limited benefits for disabilities caused by most mental or nervous disorders to two years.[92]  However, Aetna adhered to an internally generated list that identified some mental disorders that were not subject to this limitation.[93]  The list included "every type of schizophrenia but schizoaffective disorder."[94]  The court considered the DSM's explanations and a doctor's statement that "schizoaffective disorder is a condition where a person has all the criteria for schizophrenia as

---

[89] R. 65.

[90] *Id.*

[91] *See Torix v. Ball Corp.*, 862 F.2d 1428, 1431 (10th Cir. 1988) (approving the Eleventh Circuit's exploration of insurance and social security cases to interpret the phrase "any occupation or employment for remuneration or profit" in an ERISA plan).

[92] 8 F. Supp. 3d 689, 715 (W.D. Pa. 2014).

[93] *Id.* at 714.

[94] *Id.*

well as episodes meeting the criteria for mood disorder."[95]   The court found Aetna's decision to

terminate benefits based on a diagnosis of schizoaffective disorder arbitrary and capricious

because "although the Plan gives Aetna the authority to establish policies and guidelines for

administering claims and determining eligibility, a procedural irregularity exists where the

administrator relies on an internal policy that lacks any apparent medical, psychiatric, or

scientific authority for which mental disorders are included on the exclusions list and which are

not."[96]

MetLife's interpretation is analogous to Aetna's in *Berkoben* because it creates a

distinction between schizophrenia and schizoaffective disorder.  MetLife claims that the

distinction is supported in this case by the reports of Dr. Parson and Dr. Becker.  Dr. Parson, a

psychologist, noted that "[d]istinguishing schizoaffective disorder from schizophrenia and

bipolar disorders with psychotic features is often difficult."[97]  Dr. Becker, a psychiatrist, stated

that "[s]chizoaffective disorder is a condition that has features of both schizophrenia and a mood

disorder, but does not strictly meet the diagnostic criteria for either alone."[98]

These statements do not create a reasonable basis for MetLife's interpretation when

considered in the context of the DSM's explanations.  First, a review of Dr. Parson's report

shows that Dr. Parson was struggling to estimate the duration and severity of Ms. Duncan's

mood episodes,[99] an aspect of schizoaffective disorder that goes beyond what is required for

---

[95] *Id.*

[96] *Id.*

[97] R. 923.

[98] R. 952.

[99] *See* R. 923 (discussing the difficulty of determining the temporal relationship
between the mood disturbance and psychosis and the severity of depressive or manic symptoms).

schizophrenia.  Dr. Parson's report does nothing to suggest that those with schizoaffective disorder cannot meet the criteria of schizophrenia.

Next, Dr. Becker's statement is perfectly consistent with the DSM's list of diagnostic criteria, but does not include the DSM's explanation that an individual with schizoaffective disorder can also meet the criteria for schizophrenia.  This is understandable because MetLife asked Dr. Becker only to determine whether the evidence supported a diagnosis of schizoaffective disorder, not whether the evidence could satisfy the features of schizophrenia.

In sum, the extent of potential overlap between schizophrenia and schizoaffective disorder is so great that it is not reasonable for MetLife to rely solely on the name of the diagnosis or diagnostic criteria in the abstract to define the scope of the schizophrenia exclusion.[100]  The snippets from the reports of Dr. Parson and Dr. Becker—without important context in the DSM—do not create a substantial basis for MetLife's interpretation.

### iv. MetLife's interpretation undermines public policy

The Tenth Circuit has cautioned against literal interpretations of ERISA plan terms when the interpretation is unduly restrictive.  In *Torix v. Ball Corp*, the Tenth Circuit found MetLife's literal interpretation of "total disability" unreasonable where it would "deny benefits to the disabled if he should engage in some minimal occupation, such as selling peanuts or pencils, which would yield only a pittance."[101]  The Tenth Circuit relied heavily on Congress' stated

---

[100] DSM-5 at 89–90 (noting that "[t]here is growing evidence that schizoaffective disorder is not a distinct nosological category.").

[101] 862 F.2d at 1431 (quoting *Helms v. Monsanto Co.*, 728 F.2d 1416, 1421 (11th Cir. 1984)).

desire that "those who participate in [ERISA] plans actually receive the benefits they are entitled to and do not lose these as a result of unduly restrictive provisions."[102]

In this case, a hyper-literal interpretation of schizophrenia results in the denial of benefits to every participant with schizoaffective disorder simply because some of those participants may not satisfy every criterion of schizophrenia.  Further, a Plan participant initially diagnosed with schizophrenia may develop the additional symptoms of schizoaffective disorder, at which time MetLife would terminate benefits in spite of the fact that the symptoms of schizophrenia did not change.  Therefore, MetLife's literal reading is the type of overly restrictive interpretation that results in arbitrary claim denials and undermines public policy.

Weighing these factors and considering MetLife's conflict of interest, the Court concludes that MetLife's interpretation is arbitrary and capricious.  The Court will therefore overturn MetLife's denial of Ms. Duncan's claim.

### 3.  The appropriate remedy

When a plan administrator's decision is overturned as arbitrary and capricious, the Court "may either remand the case to the plan administrator for a renewed evaluation of the claimant's case or . . . may order an award of benefits."[103]  The proper remedy "depends upon the specific flaws in the plan administrator's decision."[104]  "If the plan administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision, then the proper remedy is to remand the case for further findings or additional explanation."[105]  On the other

---

[102] *Id.* at 1430 (quoting H.R. Rep. No. 93-807, 93rd Cong., 2d Sess. 3, reprinted in 1974 U.S.Code Cong. & Admin. News 4639, 4670, 4676-77).

[103] *Flinders*, 491 F.3d at 1194.

[104] *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006).

[105] *Flinders*, 491 F.3d at 1194.

hand, an award of benefits is warranted when either "the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."[106]

Here, although the Court has found MetLife's actions arbitrary and capricious, it will remand to MetLife because it is not convinced that "it would be patently unreasonable, under any standard of review, for the Plan to deny Plaintiff[] coverage."[107]  For example, it is undisputed that Ms. Duncan's condition satisfied criteria A and E of schizophrenia, but no medical expert considered whether Ms. Duncan's condition satisfied the equivalent of criteria B and C.  While the parties agree that Ms. Duncan was disabled due to schizoaffective disorder and the record suggests that Ms. Duncan's mental disturbance persisted continuously for at least 6 months— considerations relevant to criteria B and C—the Court will not substitute its judgment for that of a medical professional.

Although MetLife's favored interpretation is unreasonable, it is "not th[is] court's function *ab initio* to apply the correct standard to the participant's claim."[108]  "That function, under the Plan, is reserved to the Plan administrator."[109]  In its original determination, MetLife failed to make a good faith, supported, and documented interpretation of the Plan's schizophrenia exclusion as it applied to Ms. Duncan's condition.  In addition, MetLife failed to adequately and timely explain the basis for its denial, and failed to do the factual investigation necessary to discover whether Ms. Duncan's specific condition could fall within the

---

[106] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1289 (10th Cir. 2002) (citations and internal quotation marks omitted).

[107] *Flinders*, 491 F.3d at 1195.

[108] *Id.* (quoting *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 1005 (8th Cir. 2005) (alteration in original)).

[109] *King*, 414 F.3d at 1005–06 (quoting *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996)).

schizophrenia exclusion.  MetLife must remedy these deficiencies on remand should it again choose to deny Ms. Duncan's claim.

### 4. Attorneys Fees and Costs

Under 29 U.S.C. § 1132(g)(1), a district court "in its discretion may allow a reasonable attorney's fee and costs of action to either party."  Several non-exclusive factors the Court may consider include:

> "1) the degree of culpability or bad faith, 2) the ability of the party to satisfy the award, 3) whether an award of fees would deter others from acting under similar circumstances, 4) whether the party seeking fees sought to benefit all participants of the plan or resolved a significant legal question, and 5) the relative merit of the parties' positions."[110]  This list of factors is neither exhaustive nor exclusive.[111]

First, the steps taken by MetLife to interpret the Plan and its handling of Ms. Duncan's claim were unreasonable, and did not give Ms. Duncan adequate notice of the basis for denial. In addition, MetLife's interpretative process was not well reasoned or documented.  MetLife's late explanation of its interpretation gave Ms. Duncan no choice but to hire counsel and litigate MetLife's interpretation in federal court.  These actions weigh in favor of awarding Ms. Duncan attorney's fees and costs.

Second, there is no doubt that MetLife has the ability to satisfy an award of fees and costs.  MetLife is one of the largest global providers of insurance and employee benefits, with a net income of more than 5 billion dollars in 2015.[112]  Third, the practice of reserving a reason for denial until the final administrative appeal undermines the purpose of the Department of Labor's implementing regulations and cannot be tolerated.  Administrators may have a financial incentive to hold back a basis for denial, or to find a new basis for denial in the final stages of

---

[110] *Moothart v. Bell*, 21 F.3d 1499, 1507 (10th Cir. 1994).

[111] *Id.*

[112] MetLife, Inc., Annual Report 2 (2016), http://media.corporate-ir.net/media_files/IROL/12/121171/Files/ar/HTML1/tiles.htm.

administrative action in the hope that a participant will not pursue an appeal in federal court or to prevent a participant from submitting evidence on that issue.  Granting attorney's fees and costs helps disincentive this behavior.

Fourth, Ms. Duncan's appeal impacts not only her, but other Plan participants because it helps clarify an ambiguous Plan term.  This consideration also weighs in favor of awarding attorney's fees and costs to Ms. Duncan.  Fifth, the balance of merits tips in favor of Ms. Duncan because MetLife's interpretation relied on two statements which only briefly touched on schizophrenia and schizoaffective disorder while ignoring the DSM and reaching an interpretation that is inconsistent with other Plan exclusions.

For these reasons, the Court will award Ms. Duncan reasonable attorney's fees and costs. The Court orders counsel for Ms. Duncan to submit an affidavit detailing reasonable attorney's fees and a bill of costs in compliance with Federal Rule of Civil Procedure 54(d) and DUCivR54-2 within fourteen (14) days.

## IV.   CONCLUSION

It is therefore

ORDERED that Ms. Duncan's Motion for Decision on the Record (Docket No. 16) is GRANTED and that the case REMANDED to MetLife for proceedings consistent with this order.  It is further

ORDERED that Ms. Duncan's request for attorney's fees and costs (Docket No. 16) is GRANTED.  Ms. Duncan has fourteen (14) days to submit an affidavit and bill of costs in compliance with Federal Rule of Civil Procedure 54(d) and DUCivR 54-2.  It is further

ORDERED that MetLife's Motion for Summary Judgment (Docket No. 18) is DENIED. The Clerk of the Court is directed to enter judgment as stated and close this case forthwith.

DATED  November 10, 2016.

BY THE COURT:

_____

TED STEWART
United States District Judge